May it please the Court, Jeffrey Raskin on behalf of the Santa Maria defendants. Unless the Court has a different way of dealing with it, I'd like to spend some time addressing our arguments on our appeal as well as responses to the cross-appeal. Since the Court last saw this case, the evidence and the Bravo's theory has drastically changed. There's no longer any dispute that Tenor and Lara actually investigated Javier Jr.'s custody status. Now their theory is different. By investigated you mean called the Sheriff's office? Correct. When this Court last looked at it, there was a dispute of fact as to whether any such investigation occurred at all. The Sheriff's office submitted declarations saying that nobody called regarding Javier Jr. whatsoever. Now that story has changed and plaintiffs have completely adopted that as their theory. That in fact the Sheriff's office was called and that the issue stems from Lara correctly asking the necessary follow-up questions, the follow-up questions he was supposed to ask with regard to Mr. Franklin but failing to ask those same questions with regard to Javier Jr. This fundamental difference is enough that it makes the situation so that it cannot support liability. With respect to Tenor, there's no evidence regarding an intentional omission. There's not evidence that he acted with a design to mislead. He tasked Lara with determining whether or not Mr. Bravo was in custody. Lara provided a report and that report was relied on. You do counsel with what he did once. He was told by Mrs. Bravo that her son was in prison and showed him a letter from him of recent vintage confirming that fact and yet he instructed the deputies to continue the search. He did do that. That certainly goes to liability which we are not challenging regarding the decision to continue the search but it doesn't show an intent to mislead a judge by omitting this information. The information that he had provided by an experienced officer using an investigation technique that has been used thousands of times, that has worked 100% of the time other than this and that had in fact worked in this situation with regard to Mr. Franklin. So from Mr. Tenor's perspective, he received a report that custody status was investigated with regard to all of these targets, that Mr. Franklin was in state prison and that Mr. Bravo and the others were not in custody. He relied on that information. I thought the rap sheet showed that Javier Jr. had been convicted on unrelated charges. Correct. He had been convicted and he had been sentenced some seven months prior to that. To two years. To two years, correct. And the undisputed evidence at trial, however, is that that does not necessarily mean that he is still in custody and that is why a custody investigation was done. That custody investigation came back to Tenor saying that Franklin... What do you mean that's why it was done? Because they knew he was sentenced to two years and thought he might not be still serving? They needed to determine custody status. But that's not why it was done. You said that he had been sentenced to two years, but sometimes you don't serve two years, and that's why we did an investigation. Well, that's not why you did the investigation. You did the investigation and the officer saw a sheet of paper in which it said that he had been sentenced to two years and ignored it. Now, maybe he didn't see it. That's what he said. He didn't notice it. The jury didn't have to believe that, however. No, the jury didn't have to believe that. The question is, so what that would tell us is that Officer Tenor knew that seven months prior, Mr. Bravo was serving a sentence. Not necessarily was he currently in custody. That information... They knew that seven months before he had been sentenced to serve two years. Correct. And they did not know whether, in fact, he was still in custody. That was the question that was being investigated. Is that what they told the magistrate judge with the warrant, that they didn't know whether he was in custody and he had been sentenced? No, they did not provide anything about custody. Tenor did not write anything about custody, and he did not write anything about custody because he was informed by an officer that Franklin was in state prison, but that Bravo and the others were not. Javier Jr. had priors, didn't he? Yes. How many? I don't know that. More than one. I believe so, yes, Your Honor. What's the likelihood an experienced detective would look at a rap sheet and see that the person had been convicted and sentenced to two years in prison and that a person with Javier Jr.'s record would be walking the streets waiting for a report date? I don't have an answer to that, but I do know that the question here is whether it was reckless disregard of the truth, and it's not reckless disregard of the truth to have an experienced officer conduct a custody investigation to do so using a technique that has proven successful 100 percent of the time and in which it appears from the report that it was done correctly. It correctly found that Franklin was in state prison. There's no reason to disbelieve that, to say that it is reckless for a supervising officer to not doubt whenever they receive a report that appears to have conducted the investigation in the correct way. In terms of turning to the... I want to just be sure of one thing. I know you're talking about Tenor, but with respect to Ralston, one level above, my understanding is that he testified that he was aware that the department had a policy of verifying, if it wanted to verify state incarceration, it would contact state authorities. He also testified he knew that the county didn't have that information, but that was the approach that the city took, which was to contact the county, which it knew did not have information about state incarceration. Is that your recollection as well? It's not quite correct, Your Honor. The undisputed testimony is that the county had information regarding whether someone had been transferred to state prison. They could not tell us whether, as of today, they remained in state prison or whether they were released. That is the same approach that was used with regard to Franklin. The county was called. The jail confirmed he's not here. The next question, has he been and has he been transferred? Answer, yes, he was transferred to state prison. The next step was, and that's the established practice, the next is to ask those series of questions, and the next approach is to then call the state prison and determine, which is exactly what happened. Does the record show in this case that the second question you've just indicated was asked, i.e., has there been a transfer? I'm sorry, I missed the beginning of it. Okay. If I understood you correctly, you said that Ralston and the others called. It was aware there was a call to the county to ask whether he was there. They were told no. The second question that you just talked about was, has he been transferred? Does the record show that that question was promulgated? It is undisputed that that is the practice, first of all. I didn't say that. It's undisputed that it was asked with regard to Franklin. Okay. There is a dispute as to whether or not Lara, in fact, asked that question with regard to Bravo, but as to Ralston's liability, there is absolutely no evidence that Ralston knew that one way or other. We're not here on summary judgment, counsel. We're here following jury trial determination. A jury could have believed, based on the facts in the record, exactly the opposite of what you're arguing. Not without any evidence. The only evidence regarding Ralston. Just imagine some experienced jurors inside a jury room saying they knew that he had been transferred from county where did they think he was going? To the White House to get a Congressional Medal of Honor? He was going to prison. No. I'm sorry. As I understood the question and the evidence is that there's a dispute as to whether Lara, in fact, asked this follow-up, was he transferred? According to the county, this question wasn't asked, and so they never provided that information. And the report that goes back to Tenor is Franklin has been transferred and is in state prison. Bravo is not in custody. These others are not in custody. There's no evidence. Wait, they said he was not in custody. Where did they say he was not in custody? There's no evidence. The evidence is that the report was Franklin is in state custody. The others are not in custody. Why would they say the others are not in state custody? They have no idea whether they're in state custody. They might have guessed that he wasn't transferred without asking that question. But they couldn't possibly have known whether or not he was in state custody. I appreciate that. There's certainly a dispute as to whether it was asked. And plaintiff's theory is that this was a mistake, that it wasn't asked, and therefore Lara misinterpreted the answer. But none of this, there's no evidence that any of this made it back to Tenor. As you told us, you can't tell whether somebody's in state custody by the length of the sentence. So all they could say at the most was we did or didn't transfer somebody to state custody. They couldn't possibly say whether he was or wasn't in state custody. True. But that's what triggers the next step that we're supposed to be asking, was he transferred? The next step of the practice, the practice is to ask that transfer question. And if the answer is yes, then to follow up with the state to determine exactly that question. That's the practice that Ralston believed was followed here. What's the evidence that they followed up after county's answer? Did they follow up with the state? They did not follow up because they did not receive any information that they were transferred. That's either because the question wasn't asked or was answered incorrectly. With one of them, they did say he was transferred. Correct. With Franklin, they told him it was transferred. The next step Lara did do is undisputed. He called the state, determined that he in fact was in state prison. And that's what was reported down. Ralston has no idea as to what was asked or not asked with regard to this. Nor does Tenor. They see a record or they see a report in which it appears that Lara asked the right questions. He must have. That's how he came to the correct answer with regard to Franklin. Counsel, can I change the focus just for a minute because it's an important part of the case, and that is the judge clearly considered the settlement by Santa Barbara when determining whether this was basically the amount on which the attorney fees were keyed for purposes of Lodestar and the like. What case would you rely upon for the theory that attorney fees paid by settling defendants should be subtracted from the attorney fees that are recoverable from a non-settling defendant? I don't know that I have a case, but I can tell you that it seems an extraordinary principle that plaintiff's success against one defendant can be used as a measure of success against the other defendant. Well, that's a different issue. Well, go ahead. And I mean, my time is running short and I would like to save some time for rebuttal. But in this case, we also have a situation. We'll give you two minutes for rebuttal. Thank you. But you answered Judge Smith's question. Well, actually, there are two questions. He asked you one and you want to answer another, but we'll let you have 30 seconds or so for each answer unless you really need more. So answer your question and then Judge Smith's question. What precisely was Judge Smith's question? Okay. What I want to know is what case do you rely upon? Assuming for arguendo that some attorney fees are due and that the plaintiffs have been successful, just arguing. I know you don't feel that, but say that they were. The district judge in this case took into consideration the amount of money that was received in settlement in the Santa Barbara case. And when calculating attorney fees, subtracted from the fees that would otherwise be payable by the city of Santa Maria the amount that was paid by Santa Barbara. My question to you is as to the subtraction of the fees, is there any case that you are aware of that requires that or indeed that you consider that fees were paid in a case of that nature? So I'm understanding the subtraction. We're not talking about the offset, Your Honor, right? We are talking about whether it is appropriate to consider success against another defendant in calculating attorney fees. And as I had answered before, I don't, I'm not aware of a case. It does seem an extraordinary principle. And we also have in this case, it appears that Santa Barbara overpaid for whatever their reason for overpaying. The damages that they caused were from their entry. That is fright. That is the heart attack-like symptoms that Mr. Bravo experienced by virtue of thinking that he was being attacked by robbers, that his son was killed. And as the district court made clear here, who heard the evidence, the jury evaluated that. And that is why the jury awarded $5,000 to Mr. Bravo and not to the others, because he experienced this kind of damage from the entry. The jury decided that those damages were worth just $5,000. Whatever Santa Barbara's reasons for trying to get out of the case, it was concerned of higher liability. It wanted to avoid attorney's fees. It was willing to pay $150,000. That's an overpayment that should not be counted as success against the Santa Maria defendants. Okay, thank you. You're well over. Thank you. Good morning, Your Honors. Donald Cook for the plaintiffs and cross appellants. The three basic issues I was planning on addressing, of course, you may decide differently for me, are the evidence on the liability finding of intentional reckless omission, the superseding cause instruction, and the issue about fees. This case goes before the jury, basically in the same evidence that came up in 2011 as in the summary judgment. We know from the court's 2011 decision the evidence was sufficient to uphold the verdict of intentional or reckless omission, and what we now have is a verdict saying that the omission was intentional or reckless. Look, the defense, it was clear on the rap sheet. Two different places, sentenced to two years in state prison in September of 1995, excuse me, 2005. September 30th, 2005, verified by fingerprints, he is, in fact, in Corcoran State Prison. Then I think Judge Smith picks up on an important point, too, that once Tonori is told he's in state prison, he directs the search to continue. Tonori did not care about Junior's custody status. That's what that fact indicates. I'll ask you just because we are short on time. Tonori is one thing. I'm a little concerned about the Ralston matter, though. Ralston, basically he had before him the very same thing that the magistrate judge had, did he not? He had, but more. He had the warrant affidavit. He also had knowledge of the department practice. The department practice, and they jump up and down. But the reality is, would there have been anything, well, I guess you would say that the fact that he had been convicted is enough to take you to the next step as to why he would be concerned about what had been asked, right? Sure. I mean, Tonori, excuse me, Lieutenant Ralston knows what this department practice is, knows that, gosh, they're going to be checking with county jail to determine state custody status? That's a problem, which, of course, he later acknowledged it was a problem, and they should have checked with the state prison authorities. So he has knowledge that the practice, what the practice is, and that it was followed in this case, did nothing to take any steps to change it. It's foreseeable, and because it's foreseeable, it's deliberate indifference or recklessness. Is that your position? Well, the position is, it certainly is reckless, and it also shows his essentially ratifying what Tonori, Laura, the subordinates were doing here, relying on the county to tell them if someone's in state custody. Can I move you forward to the attorney fee thing? Because at least personally, that's the main thing I'm struggling with. Here you have a case where, in the Santa Maria portion of it, you've got a $5,000 award to Bravo Sr. You have an amended judgment giving a $1 award to Mrs. Bravo and the child, the son. Is it son or daughter? Daughter, granddaughter. Sorry. Eight years old at the time. Okay. Regardless of the amount, these are relatively small amounts. Relatively small? Really small. Okay. Okay. If you don't consider the Santa Barbara money, you've got a very high ratio when you look at the million-dollar award. Given our case law, and I was involved in one of them, the Fontana case, I'm really concerned. So for a minute, let's put aside the Santa Barbara thing. How can we justify, even on the important point that we want to encourage counsel to take these kinds of cases to help correct, you know, malfunctions and excessive actions by police departments and the like? I get all of that. But $5,000 to a million is a really big number. Sure. If we don't consider the Santa Barbara number for a moment, what case do you rely upon to help me get there to say, okay, judge, you know, you were right. This is really an important case. What happened here was just terrible. Let's go for it. If you're looking for a case that says a million dollars is good for a $5,000 award, I know of no such case, okay? What? I know of no such case that says that. I'll tell you that. And, of course, you're obviously familiar with the Rivera case, the Thompson case. I think what you have to look at here is how did we end up with a million-dollar fee award? We ended up here because Santa Maria took a take-no-prisoner, no-holds-barred position. They refused to make any kind of reasonable settlement offer, okay? I mean, the evidence is there in the record. And from plaintiff's standpoint, they had no choice but to continue to litigate, to litigate, to litigate, right? This is an example. I know it's discussed in the Ninth Circuit case. It slips in for the moment. But when you have an opposing party defendant, perhaps it's because they're funded by taxpayers, that do not take economics into consideration, we support our clients, the police officers. What choice do you have? Does that excuse the district court from engaging in an analysis comparing the amount of fees sought with the result in terms of the damage award? No, you always have to make that analysis, of course. Where is that? Where would I find that in the record? Were the district court engaged in that analysis? Well, it's in the discussion on the fee order, the order from, I think, March of 2014, when the court denies their new trial motion denies ours. But I think this also gets back into the superseding cause instruction in our new trial for damages. I know this is not perhaps as direct as an answer as you were looking for, Judge Hawkins. Answer at all. I'd like to know where it is in the record that the district court, in making the award, compared the amount of fees sought to the amount of damages awarded. It would be $5,002. And tacking onto that, isn't that what Farrar, the Supreme Court case, requires? Well, Farrar is discussing a nominal damages award case where there was no actual injury of any type whatsoever. It was strictly a procedural victory, number one. That is not this case. Here, there was an actual constitutional injury causing a real injury. The forced nighttime entry into a home, number one. And one plaintiff recovered damages, $5,000, admittedly modest, and which we also say was based only on the Santa Maria search, not for the initial forced nighttime entry. Would the argument be the same if the jury had awarded $1 to each of the plaintiffs? The argument would, yes, essentially have been the same, but again, I'm coming to the point about that superseding cause instruction and the significance it plays here. You read the verdict form and you look at the jury instructions. It's plain, I would submit, what happened here. The jury decided that the chief cause of injury in this case was the initial forced nighttime entry by the Santa Barbara City SWAT team. Of course, blowing the door open, breaking the glass, the flashbangs, the men dressed in black, pointing guns, etc. Obviously a frightening experience I would submit for anybody. But that, of course, was Santa Barbara City. And the jury had before it the superseding cause instruction, which permitted Santa Maria to say, those injuries were all the fault of Santa Barbara City. We cannot be held liable for it. And that's the jury accepted. And I submit, when you look at the evidence, the continued search by Santa Maria, obviously not anywhere as frightening as that initial break-in. And Javier Sr.'s distress, that occurred during the continued search. So we really have to back up to that superseding cause instruction. Was there a factual basis for it? Let's assume, even if there is, to get back to my colleagues and my apparent dilemma in this thing, FAR seems to really require us to focus on what was awarded. They don't even talk about superseding instruction, and I realize you said that was just a nominal issue. The reality is, in this case, your chances of getting a million-dollar verdict or, I mean, attorney fees, is much, much higher if you add in the Santa Barbara settlement. True. Right? Then there's really not much of a question. I'm in a better position. Now, the district judge went to some effort to try to explain why he thought that was appropriate. Is there any case law that you know of that authorizes him to do what he did? Corder v. Brown, this Court's decision in 1994. Now, that had to deal with an offset of attorney's fees for a settling defendant. And what the Ninth Circuit held is that, yes, you factor in the settling defendant's payment of attorney's fees. Well, the position here is you take into account not just the attorney's fees that the settling defendant paid, but also what you got, the plaintiff got, from the settling defendant. Right? Those attorney's fees were for a reason against Santa Barbara City. It was because of their no-knock break-in, which our theory all along, from day one, has been Santa Maria's responsible for that no-knock break-in and, of course, much more. Because they called in Santa Barbara. Even they called in Santa Barbara. Now, I want to point something out about what the District Court said at page, I think it was, page 18 of its order. In rejecting our claim that there was no factual basis for the superseding cause instruction, the District Court said the warrant affidavit did not ask for a SWAT team. And he's correct. The sworn affidavit did not ask for a SWAT team. You know, I don't know why you're getting into all these specifics. Maybe it's necessary from my colleague's standpoint. It just seems to me the question is where the court finds that there are important public benefits and that there was a great victory in achieving for the public those awards of new rules that will stop police malpractices. And there's only a nominal or a minimal amount. The question is to what extent can you give attorney's fees, which were clearly earned in order to achieve those public benefits. To what extent do you not receive them because there's a small financial award to your client. And as the District Court said, although only one of the plaintiffs obtained a damage amount for $5,000, they obtained a verdict and then goes on to say about the importance of the public benefits. Now, he obviously was aware of and said that there was only a small financial award. He then went on to say that you had an excellent result, nevertheless, because of the changes you're going to force in police practices. Now, you know, we've got all kinds of – this is another one of those things where there are factors. You have to look at factors. You have to look at the public award. You have to look at the public benefit. You know, you can read these things differently. The city of Riverside, it seemed to me, made it very clear that even if there were a small financial award, if you achieve substantial public benefits, a large award was warranted. Now, that opinion was written by Justice Brennan, and it was concurred in by Justice Powell, who had written the initial opinion that set forth this rule. And Justice Powell said Justice Brennan overread his opinion in emphasizing the importance to the public benefits as opposed to the contrast in the low financial award. Why doesn't your – why doesn't this district court decision comply completely with city of Riverside? Well, plaintiffs submit that it does. Okay? Our point is – I go back to one. How did we get here? We got here because of the position that the city took. It would not engage in any kind of meaningful settlement negotiations. And we – plaintiffs had no choice, however, to simply take the case to trial. First, take it through the first appeal, and then take it to trial. This is not a Farrar case, because Farrar, very simple, classic kind of nominal damages case, right? Procedural victory, no change in department policy, nothing that's going to send any kind of a signal to police agencies to adopt more appropriate behavior. This case has all that. I'm out of time. If there's other questions, I'm happy to answer them. I would submit. Thank you. Thank you. Your Honor, to address the issues very quickly. In terms of Ralston, I think you heard what you needed to hear. The additional evidence that the judge didn't have was that Ralston knew what the practice was and knew that it had been followed. That is the information he had, that it had been followed. And it's undisputed that the practice is not just a call-up and ask one question, is he in the jail? It is a two-step practice in which you ask the follow-up question, the question that was asked with regard to Franklin. That is what Ralston had before him. He had no reason to believe anything else. That is why he cannot be liable. In terms of the fee issues, counsel says that this is what had to happen. He had to keep asking, keep pushing and pushing and spending more and more because no reasonable settlement offer was on the table. This is a different analysis. This has to do with duplicative efforts. Was it necessary? McGinnis tells us. Counsel, regardless of your perspective on whether that occurred, if a municipality does a really full-on no-settlement, tough position that just grinds out everything, are we to take that into account when we review the amount of fees awarded by a district court? There's two answers. First, this goes to was it necessary, but not the separate Farrar-Hensley analysis about whether it was justified, whether the actual amount awarded justifies it. And they're pushing for big damages. We're offering significant amounts well above what they received. Of course, we're going to be defending just as heavily as what they are seeking. If I could just briefly address Judge Reinhart's question regarding the fee issue on the important public policy question. Yes, the district court did, in fact, point to public policies, but it's also true that the policy issues that he's talking about are not any kind of widespread issue. In case after case, that's the significant issue, that this is shutting down a beleaguered police department or curbing widespread police abuses, widespread animus towards the Latino community. In this case, the practice, which is a two-step practice, again, that requires asking that additional question, but that practice has... Let me just say this to you. The district judge found that these were excellent results and he thought that he had obtained important policy changes that the police department would have to make. Now, you disagree with his analysis. Are you saying that you should prevail because he was wrong as to the importance of the three changes that he thought that this case would accomplish? I think these issues are reviewed for abuse of discretion. The standard on public policy is considering how important this public benefit is, how widespread it is, and that is an issue that this court reviews. That's the answer, yes. You think that what he found to be important changes were not that important. Right. The change to a practice... The question I have is let's just assume you have a client, a civil rights lawyer has a client who's entitled to a $5,000 reward, award. Maybe it would be entitled to $100,000, maybe to nothing. A jury decides $5,000, so let's assume those are his damages. If it takes $1 million worth of work and nobody denies that the work was done, the rates were reasonable, it took $1 million to prosecute the case to get the $5,000. Should the alternative be not to bring a case that costs $1 million to prosecute if your verdict's only going to be $5,000, $10,000, $25,000, even $100,000? Could you just drop that case? Or if it costs $1 million to prosecute it, should you prosecute it and be rewarded with those fees? Well, it's two answers. First of all, it's very difficult to imagine a case that is only worth $5,000, that requires $1 million to prosecute, where it doesn't have this. Typically cases settle when they are small dollar amounts, and it doesn't require this. Secondly, yes, the Supreme Court has told us that the critical factor, and this circuit has told us that the most critical factor is what was actually received with this additional of if there is a substantial widespread public benefit that that can add to it, but the amount of attorney's fees don't just have to be what was actually spent to obtain this. It has to be justified by the amount of the recovery, where the amount is a mere $5,000, shockingly low compared to what they had sought. No punitive damages. They're telling you it's modest. They're seeking a new trial on damages, particularly because they believe that they got far, far less than what they had hoped. And the public benefits that are identified are the change of a practice that is undisputed, has never caused any problem ever, and here apparently caused a problem, except in this case, but it is not a... It's not ever. Yes, never before this. It is not a widespread problem to change that practice where, in fact, the theory is that Lara failed to comply with the practice by failing to ask the right question, and it's undisputed that it is a two-step process that you are supposed to ask that question. What do you think the fee should be? I think that they should be rather low. I don't know the amount. At some point it is certainly within the discretion, and it is difficult to start arguing with the particular amount as it starts getting lower, but 283 times is 1.2 million on a $5,000 claim. We have never seen, from our research, any disparity even close to this amount. Do you have any dispute with the amount of hours spent or the hourly rate? We're not challenging either of those. We're challenging only on this issue of whether it's justified by what results were obtained. The answer is really, I don't know what the final one was, but the district court mentioned that as of the first appeal, the city's legal bills were higher than the plaintiff's. I guess the answer is, if you only get nominal damages, and we do have one verdict here in the Central District, where it was $1 damages and $600,000 fees, I guess your answer would be you can't bring a case where you only get nominal damages unless you have a volunteer attorney. There are lots of cases in which the damages were nominal, but the policies have been changed. That's really often the fundamental reason for civil rights suits, is to change the policies. But under your theory, if you don't get a lot of damages in doing it, you can't pay the lawyer. No, that's not our theory. Our theory is, I appreciate it, there are certainly... a verdict financially that would measure by that the attorney's fees would be. But I said if you have only nominal damages, but you change the policy, you couldn't get, I don't know what measure you would have when you get a dollar verdict where you get nominal damages, what your idea of attorney's fees would be. It certainly doesn't sound to me like you're saying there could be substantial attorney's fees if you only get nominal damages, but you change the city's policies. The court has told us that when there's nominal damages, ordinarily you're entitled to no or very low fees. Let me ask you... Go ahead and finish and then I'll... There certainly is an exception in the case of obtaining a very significant public benefit where it changes a widespread issue, but even then, it has to be commensurate. The amount of attorneys then needs to be commensurate. What's commensurate to a dollar? No, I'm sorry. What's commensurate is... It has to be commensurate with the extent of the public benefit. If you are... That's where I started with you then. Our problem here is to determine how important the public benefit was. Yes, and in a case where you've changed a practice that has never before had any problem, this is not a widespread issue. And to change that practice is not a $1.2 million kind of victory. It isn't. We've seen plenty of cases where it is maybe adequate for a big public policy, a much bigger public policy. You had one minute. We're now up to eight. One quick question, please. How do you reconcile these two cases? As my colleague mentioned, the city of Riverside was a 1986 case where the judge, the justice said, serving the public interest by vindicating important constitutional rights is a factor we should consider very heavily. And you've got Farrar, which is 1992, which is, of course, six years later, says the most critical factor in determining the reasonableness of a fee award is the degree of success attained. It is an abusive discretion for the district court to award attorneys fees without considering the relationship between the, in quotes, extent of success and the amount of the fee award. How do you square Farrar and Riverside? I think Farrar tells us, as have cases since then, that the amount of the relief you actually obtain for your client is the most critical factor. It is the number one. Other factors do exist. They are of a lesser value. And you need to consider both of those. Minimal success achieved has to be considered. There may be some additional attorneys fees that you get beyond just that if there is some public benefit, but it has to be a very widespread public benefit. It has to be, you need to then have a fee award that is commensurate with that extent of that benefit. Does city of Riverside use the word widespread? I don't know if city of Riverside uses it. Is that your argument? No. There are many, many cases by this circuit that have always founded it on. The question was does city of Riverside, when it talks about benefit, use the word widespread? I don't know the answer to that. Thank you. Thank you. Case just argued will be submitted.
judges: Reinhardt, Hawkins, Smith